John Antoon from the Middle District of Florida. He comes to us with a great deal of experience, having done private practice, been on the Florida State Appellate Court, and then having been appointed to the District Court bench in 2000. He is now a senior judge and is still very generous with his time for us and other courts. We always benefit greatly when we get the services of a very experienced and fine District Court judge, which is what we have in Judge Antoon, and we really appreciate you being here this week. Thank you. All right. We will call our first case, which is U.S. v. Edward Feldman and Kim Feldman. And speaking first for Edward Feldman would be Mr. Weisbrod. Did I pronounce that correctly? Yes, you did. Thank you, Your Honor. Thank you. Good morning. I am David Weisbrod. I represent Appellant Edward Feldman, and may it please the Court, I'd like to focus my argument on the first issue that we raised, which challenges the imposition of concurrent 25-year sentences for Counts 2 through 4 of the indictment, which include a component of which, rather, is a 20-year mandatory minimum as to each of those counts, and those mandatory minimums were also run concurrent. So Section 841 of Title 21 sets forth some broad prohibitions regarding controlled substances. A1 prohibits the distribution. B2 imposes a maximum term of five years for Schedule IV drugs that are distributed. And Section B1c imposes a maximum sentence of life and a mandatory minimum of 20 years if death results from the distribution or dispensation. And that's what your client got on three counts, right? Correct. All those subsections were charged in Counts 2, 3, and 4. And so the indictment as to each count listed the specific Schedule II and Schedule IV drugs. It included both the types that would get you death, types that would get you the life sentence, and the type that wouldn't. Correct. So combine those two. I think we kind of got that part. All right. And so the jury then was asked to return verdicts systematically and pursuant to Burrage and Alleen which would address the aggravating elements. And so as to each count, they found appellant guilty of dispensing or distributing Schedule II and IV drugs, the drugs that were charged. They found that death resulted from, quote, the use of one or more of the listed controlled substances, plural. And then very specifically, that death resulted in each of the individual listed counts from all of the drugs. In other words, as to each count, for instance in Count 2, they were listed oxycodone, methadone, which were Schedule IIs, and alprazolam, which is a Schedule IV. And the jury checkmarked all of those indicating death resulted from the use of all of them. And they did likewise for Counts 3 and 4, checking off all the Schedule IIs and all the Schedule IVs. So Burrage, the Supreme Court case, in interpreting B1c, the death results from portion of the statute, says you have to have but-for causation. That the Schedule II drug, which is what B1c controls, has to be the but-for cause of the death charged in the particular count. What Burrage specifically did not include in the but-for analysis was a contributory cause of death. So the government wanted in Burrage for there to be a wider ranging cause of death that would apply for the 20-year mandatory minimum. Supreme Court rejected that approach and stuck with the but-for for the Schedule II drugs. Of course, under Alleen, the jury must find specifically the aggravating factor that results in an enhanced mandatory minimum. So when you put the two together, our argument is that the jury was required to find that the Schedule II drug was the but-for cause of death in order for the 20-year mandatory minimums to apply in counts two through four. These jury verdicts don't allow for that conclusion to be reached because they checkmark each and every drug, the Schedule IIs and the Schedule IVs. Had they just checked oxycodone was a qualifying drug, right? Had they just checked oxycodone for each of the counts, then you wouldn't have your argument, correct? That is correct. But by checking, is methadone included in one of the appropriate Schedules? It would be a two, yes ma'am. All right, so but by including the alprazolam and the diazepam, you're saying they essentially did exactly what Burrage says you can't do. A cocktail of drugs together can't be the basis. It has to be but-for the Schedule I or II drug, isn't that your argument? That is the argument. And I think there's a reason why they chose to do it that way and that's because when you look at the cause of death testimony from the medical examiners as to each of these three individuals, the cause of death was multiple drug intoxication. But I thought for at least two of the victims, there was testimony that the Schedule I or II drug would have been-was sufficient to cause the death. It was-the testimony was very mixed. So the legal cause of death that the Flores Statute requires the medical examiner to issue as to all three were multiple drug toxicity. As to, for instance, Dr. Thogmorton in Count III, he said the oxycodone amount was not lethal. You know, he would not say that the individual would have died without the Schedule IV. Dr. Wilson, for instance, as to Count IV, he was the medical examiner, he said it was Dr. Feldman. And as to Joey Mays, the testimony was the death was due to multi-drug toxicity. He listed the three drugs and he elaborated on his testimony at 367 page 215. It was a toxic combination of all drugs, which led to the death. But your argument really doesn't turn on the evidence and whether there was evidence of that, does it? Your argument turns on what the jury determination was. Right. But the reason why we go back a little bit to the evidence is because my sense is that the indictment alleged the counts the way it did because you had this medical examiner testimony, medical examiner findings, as to the multiple drug toxicity as to each of the three individuals. I mean, the government was sort of stuck with that. So the evidence is germane to the extent it explains why the government proceeded with this verdict. I'm surmising that because, for instance, in the Webb case that this court decided a few years ago, the jury instruction was very specifically limited to just the Schedule II drug. That wasn't, again, done here because of the way it was charged in the indictment with the listing of the Schedule IIs and the IVs. Did you challenge the verdict form as being misleading or incorrect in any way? Counsel had challenged at Rule 29 time the inability of a jury to be able to find death resulting solely from the Schedule II drug. But at the time of the jury instructions and preparation of the verdict forms, it was clear that the district judge was going to include all of the drugs in the instructions and in the verdict form because that's what was charged in the indictment. I looked in the docket to try to figure out what had led us to what seems to me a very problematic verdict form from the get-go. And I saw that defense counsel, it may not have been you, but defense counsel had tendered a different verdict form. Is that accurate? And it was a verdict form actually that would have probably avoided this problem had it been given to the jury. I honestly didn't look at the tendered verdict form because it wasn't ultimate. I think when they were discussing the verdict form, I think counsel said he was willing to accept the government verdict form. And again, the judge, the district judge had reviewed the correctness of charging multiple drugs that that was something that was obvious. And of course, the government's verdict form had the jury again just checked off oxycodone. It's not that the jury form necessarily was always going to be a problem, but as it turns out here, it didn't help the government by having them check everything. Right. And they could have asked them to just check the Schedule IIs. Yeah. All right. Thank you. Thank you. Mr. Burns, how are you? Doing well. Good morning, Your Honors. May it please the Court. I'm Thomas Burns, and along with Mike Stanton, we represent Kim Feldman. Let's talk about double jeopardy, Dawbert, and sufficiency. The double jeopardy issue is really all about context of what happened during that hearing. To declare a mistrial, the district court needed to determine whether Kim Feldman consented to the mistrial. And if she didn't, whether there was a manifest necessity for a mistrial. Our position is that there's neither express consent nor implicit consent. I don't understand the government to be arguing that there is express consent here because there was no strict compliance with Rule 26.3. Instead, the government's arguing— But what does the rule say? It says an opportunity, doesn't it? Doesn't it refer to giving counsel an opportunity to— Yes. That is a word in the— The opportunity seemed to last for a long time, an overnight consideration of the issue. That's true. But that's why the context is so important in those hearings because here, I think that the district court understood the mistrial being directed only toward Dr. Feldman. Here he answers a question when he's asked about prejudice and he says, well, I agree that there would be prejudice, but implicit in that answer is the prejudice would be to Dr. Feldman. And the district court's response to that is like, well, I don't even understand how this would be prejudicial to your client because it only concerns Dr. Feldman. And so from that point, he's more or less silent because he's like, well, this doesn't even concern he, meaning the trial lawyer for Mrs. Feldman, this doesn't even concern my client. This is all about whether a mistrial is going to be declared as to Dr. Feldman. And then, you know, the district court certainly anguished over this decision. I mean, there's like proceedings the first day when the questions asked, there's proceedings the second day. He's thinking a lot about it. He asked the parties to research this. But the context of that is all directed toward Dr. Feldman, not Mrs. Feldman. And then when the district court ultimately determines I'm going to declare a mistrial,  Well, Mr. Burns, is it fair to say that the really the only thing that that counsel for Mrs. Feldman said was we find no authority, well, there's no way that there could be a curative instruction, an effective curative instruction. That's about it, isn't it? It's it. But he's actually, I think, interrupted when he's giving that answer, or I think there's two answers. One of them he's interrupted, but I think implicit in what he was going to finish that sentence was this is it's a prejudice to Dr. Feldman that cannot be cured by an instruction. It's just it's just too bad of a question. But he's not saying. He didn't add the phrase, by the way, doesn't hurt us and we'd still like to keep going. Exactly. Exactly. Those words weren't uttered, correct? Right. And that's why our position is that the consent was neither expressed nor implicit and also why there was no manifest necessity to declare a mistrial as to Mrs. Feldman. There was certainly a manifest necessity to declare a mistrial as to Dr. Feldman because of all the reasons that the district court identified. But as to Mrs. Feldman, the district court said there's no prejudice to you. After the district court declared mistrial, if that was Mrs. Feldman's position, everybody's leaving the courtroom. Did Kearney say, wait a minute, why are we leaving? We still want a trial. I suspect they were going out the door just as well. Right. And that's why it happens in a snap. The district judge and our reading of the context there is it happens. The judge says, jury, please leave. Status hearing December 10th. So the timeline is important. The timeline is the improper questions asked November 17th. The second day's hearings. He didn't say, wait, judge, don't send the jury out, we've still got a trial, nothing like that. It would have been better had he done that. But he didn't do that. November 18th is that second hearing when the mistrial is declared. Thanksgiving, it's important to keep that in mind, Thanksgiving in 2015 was November 26th, 2015. But when the judge declares a mistrial, he says, let's all come back here December 10 for a status hearing. I want to know if you're, what are you going to do? Are you going to like do a new indictment? Are you going to retry these people? You know, prosecutor, you tell me. That's the day that he files the motion saying you need to dismiss this indictment on double jeopardy grounds. So that's really the first opportunity to do that. And a good authority for that is United States against Dixon, which is an Eighth Circuit decision from 1990. And that's cited in the commentary to Rule 26.3. And that's what Rule 26.3 was directed to in the first place. The whole point is to get the district judge to get buy-in from all of the defendants. And there the Eighth Circuit said, well, it's not really a problem that the guy didn't immediately as the judge declares this mistrial say, look, I want a trial still as to my defendant. It's okay because we're going to, and that's, it's even, I mean, because it's cited in the commentary, I guess, the predated Rule 26.3. But that's the whole point of why we have Rule 26.3. And our position is just the context undermines any finding of implicit consent and undermines the finding of manifest necessity as to Mrs. Feldman. Your Honor, I wanted to address Dobbert insufficiency, but obviously I'm a pacifist. If you want to hear something about that, I can tell you otherwise. Why don't you just allow, allow you to articulate just in a sentence or two what it is so you can clarify. Okay. So our point on Dobbert is just that we did preserve the error for review under the normal abuse of discretion standard because the motion in limine order was sufficiently definitive for Rule 103b purposes. It made clear what evidence was inadmissible and it was final rather than provisional. The authority for that is Tampa Bay Water against HDR Engineering Incorporated. And then as to sufficiency, the parties largely agree on what the evidence actually was. It's just a difference. We have different interpretations of Cosby against Jones. And you just need to take the evidence, interpret Cosby against Jones, and tell us what the outcome is. All right. Thank you. Thank you. All right. Ms. McNamara. Good morning. May it please the Court, Linda McNamara for the United States. With respect to Dr. Feldman's sentence, the issue is whether the jury's verdict supports the imposition of the statutorily enhanced sentence. The question to me is whether the jury imposed a statutorily enhanced sentence under Barrage. Well, this verdict finds that each drug specified on the verdict form was a but-for cause of death. And let me explain to you why I say that. The Court instructed the jury first to consider whether the government had proven beyond a reasonable doubt that death had resulted from the use of the controlled substance it's charged and that to find that death had resulted, it had to find beyond a reasonable doubt that but-for the decedent's use of the controlled substances, the decedent would not have died. Now, obviously, those instructions don't get us all the way there as to whether those controlled substances were just a contributory cause or the but-for cause. But we have to also look at the verdict form and the instructions as to the verdict form. Addressing the form, the Court told the jury that if it found that Dr. Feldman had illegally distributed controlled substances, they would go on to the next question, which was, we the jury find beyond a reasonable doubt that the death of, with respect to count two, Joey Mays, resulted from the use of one or more of the following substances, oxycodone, methadone, alprazolam. That is, but for his ingestion of the controlled substance, singular, charged in the indictment, he would not have died. You would mark yes or no. The Court then says if you'd answered yes, you would go to the series of substantive questions. That is, if you find beyond a reasonable doubt that the death of Joey Mays resulted from the use of the following, you would mark yes or no adjacent to each of those substances. The Court thus directed the jury to consider each of the particular substances separately as to the question of whether the victim would have died but for his ingestion of those particular substances. And in its verdict, the jury found that each victim would not have died but for his ingestion of each of the substances marked on the verdict form. But does the evidence remotely support that? I mean, what you'd have to conclude, it would be that rare case that Justice Scalia said in Burrage with the special rule where you could die by a stab wound and somebody shoots you at the same time, a very odd scenario. And for that to make any sense, the jury would be saying, if he just had oxycodone and nothing else, he would have died. If he had just had alprazolam, he would have died. If he had just done the third one, just had diazepam. I didn't read anything in the evidence suggesting that by itself, one of those non-Schedule 1 or 2s would have done the trick. I agree with you, Judge, but the question here is whether the evidence supports their finding that the Schedule 2 drugs were a but for cause of death. But if they're necessarily, they're obviously confused then because if they're saying that the diazepam by itself would have done it, and we know there's no testimony to that effect, we have to necessarily conclude when they're mixing that with oxycodone, the jury instructions were not very precise at all about this. That they were really, what they were doing is what the Supreme Court said you can't do. They were saying this toxicity, multi-toxicity, this drug cocktail is what did the trick. That violates the directives of Burrage. Judge, I don't think we can try to get into the heads of the jury and figure out what they were thinking in finding that each was a but for cause of death. That's not what we do with jury verdicts. We look at what the verdict is and we look at whether there was evidence to support the pertinent part of the verdict. That's what we have to do here. And the question is, is the jury verdict, with respect to the but for cause of death as the Schedule 2 controlled substances, is that supported by the evidence? And we do have evidence to support the finding on the jury verdict that the Schedule 2 substances were at least a but for cause of death. And it doesn't have to be the only but for cause of death, but it does have to be a but for cause of death. And we have evidence to that effect. We have, with respect to Joey Mays, his own witness, Dr. Adams, testified that Joey Mays had died as a result of intoxication by methadone. Dr. Adams said that the methadone had stopped his heart. Our witness, Dr. Wilson, likewise said that the amount of methadone in his system would have been enough, in and of itself, to have killed Mays. Now Dr. Wilson also said that all the drugs, methadone, oxycodone, and alprazolam, had acted synergistically to cause Mays' death. But just because there was a combination of drugs, that does not mean that all were mutually contributory. Because Barrage tells us... On JM, the examiner had indicated the cause of death was multi-drug toxicity. Correct. But that's not good enough for you. But you're saying he also made an inconsistent statement that he thought oxycodone enough was enough? Judge, I don't think that's inconsistent at all. Whenever a person takes more than one drug, the drugs will act synergistically. But that doesn't mean that the defendant gets a pass just because the Schedule IV drug sped up the results of the Schedule II drug. That's what we have here. We have... But you're saying he made a statement that had the victim taken just the oxycodone alone, that would have been enough? Or had he not added the oxycodone to the other part of the cocktail, that would have been enough? There's testimony to that effect? With Joey Mays, it's methadone, but yes, and that's a Schedule II drug with respect to Joey Mays. With the other two, it's both oxycodone. Joey Mays is methadone. Nothing in... Correct me if I'm wrong, but nothing in the instruction says that each drug has to be a but-for cause, right? That's correct. And obviously, we could have had something that was clear with the verdict form and with the jury instructions, but we do have a verdict form here that finds that but-for each of these drugs, the victims would not have died. And we have evidence with respect to the Schedule II drugs. But we know that we don't have evidence that but-for the Schedule IV. We don't have any evidence of that. That's true. We don't. But like I said, we can't get into the jury's head and try to figure out what were they thinking. We have to take the verdict form as we find it. And the fact that we don't have sufficient evidence as to the Schedule IVs being a but-for cause of death, that doesn't affect the validity of the verdict as to the Schedule IIs being a but-for cause of death. And we have evidence on each of our defendants to support that. I mean, so... And the defendant's verdict form, we wouldn't have had this problem. The government didn't want to use the defendant's form. Well, ultimately, they agreed to use our form. I mean, and to the extent that there was ambiguity in the verdict, once the verdict was returned with all three or all two of the drugs checked, they could have raised a question before the jury was discharged to say, this doesn't sufficiently establish that the Schedule IIs without the Schedule IV was a but-for cause of death. We have to take this verdict form as we find it. They never alleged that this verdict form resulted in some type of ambiguous verdict. It's really your responsibility. You created a verdict form that was bound to get us where we were. But Judge, we have a verdict form that finds that but-for the Schedule IIs, the victim would not have died. Do we have evidence as to the Schedule IVs? No, we don't. But ultimately... And there was nothing in the instruction. Of course, I guess the defendant didn't request it, but there was nothing in the instructions to guide the jury. Any lay person is not going to understand anything we're talking about. The instructions don't break it down into... It's very important, members of the jury, that you determine whether a certain kind of drug cause, it's by itself. The judge doesn't do any of that. I would think a jury might infer drug cocktail's good enough from those instructions. The district court did instruct the jury that they had to find that is but-for his ingestion of the controlled substance charged in the indictment, he would not have died. You would... That's each of the three. They're all controlled substances. Yes, you would mark yes or no. They have to look at the verdict form and say but-for oxycodone, he would not have died. But-for methadone, he would not have died. But-for alpazolam, he would not have died. And that's what the jury did. And that's the verdict that we have. And so long as we have evidence to support that, as to the Schedule IIs, we have a sufficient verdict to support the sentence here. Does the record disclose why the Schedule IV substances were included? I mean, it seems so simple just to... It does, yes. ...have eliminated those. No, the record doesn't disclose that. The Schedule IVs were charged in the indictment and included on the verdict form. I suspect the thinking was that if all that was checked was the Schedule IV, then we wouldn't have, you know, the statutory enhancement. But... And if all that were checked were the Schedule IIs, obviously, we wouldn't have this issue. It's amazing to me. This is a pretty big deal. It's going to really increase the sentence. You don't have a lot of these prosecutions. At the laxity of the prosecutor, this is sloppiness. At the time, this was a relatively new issue. The prosecutor was trying to understand barrage and what it required and what it entailed, as all the parties were. And in fleshing this out with the district court, this was the verdict form that everyone thought would be sufficient to resolve this question. And I think, ultimately, it is. Now, would it have been better if the Schedule IVs had been on there? Of course, it would have been better. But having them there does not defeat the verdicts finding that but for these Schedule Victims would not have died. And as I said, we have evidence as to that with respect to each victim. I've explained that evidence with respect to Joey Mays, with respect to Ricky Gonzalez. The medical examiner said that his cause of death was oxycodone toxicity with a contributory condition of diazepam intoxication. He said, in other words, he'd been poisoned by the oxycodone with the diazepam speeding up his death from that. Now, Barrage says that but for causation exists where a particular controlled substance combines with other factors to result in death, so long as the other factors would not have resulted in death. So in Barrage, the witness could not say with certainty that the victim would have died but for his ingestion of the heroin that the defendant had distributed. But here we have an expert witness, sometimes both expert witnesses, agreeing that the amount of the Schedule II drug in the victim's systems would have killed him no matter what. And no witness testified that the Schedule IV substance would have killed the victim in and of itself. Meaning that, again, the verdict was incorrect as to that. But he doesn't get a pass just because the Schedule IV substance sped up the death of these victims. And we have a verdict finding that there is but for causation with respect to these Schedule II drugs. And I was going through the docket quickly yesterday trying to read different things. Is the colloquy before the instructions in the verdict form, is that transcribed? Is there a colloquy? Yes, it is. So I can find that in the record. Yes, and I would direct you particularly to Volume 373 at 262, which is where the court is explaining the verdict form to the jury. Okay. And I really think... I mean, there's a colloquy also where the verdict form and instructions were discussed before the legal... Oh, yes, yes. Is that also in the record? Yes, that is in the record. And that's either in Doctrine 373 or the volume before that. But yes, that is. And, you know, as I said, there was no objection to this. This was the verdict form that everyone agreed to, and no one found fault with once the verdict was returned. And the bottom line here is I think if you read through the jury instructions and you read through the instructions with respect to the verdict form, you will see that this verdict finds that but for these Schedule II controlled substances, these victims would not have died. And that verdict supports the sentence imposed. I can go through the evidence with respect to that but for causation with respect to the other witnesses if you'd like. We can probably do that since you have a few other issues to talk about. Okay. With respect to the double jeopardy question, well, clearly the judge gave Mrs. Feldman's attorney ample opportunity to weigh in on the question of whether a mistrial was necessitated there. Right after Dr. Feldman had objected, had moved for the mistrial, his counsel said, Judge, and it's my position, Dr. Feldman said, Judge, it's my position that a curative instruction is not going to cure the prejudice. And then Mrs. Feldman's counsel said, Judge, Mrs. Feldman has the same position as this is a conspiracy case. With regard to that, I agree. I don't believe a curative instruction is going to and then was cut off. And then the court said, I don't see how this could prejudice your client. Now, she was referring to this being a conspiracy, obviously implying that because it's a conspiracy, they're all bound up together, so there's no way that a curative instruction could cure the problem. And then, of course, once the court came in and ultimately granted the mistrial, as you pointed out, she didn't say, Wait, that wasn't as to me. I want to continue. So she had ample opportunity and obviously didn't object with respect to that. Now, with respect to this, what he's calling a daubered issue. Before you go there, what is the standard of review on the double jeopardy issue? The standard of review on the double jeopardy issue on whether the court. Is it abuse of discretion? Judge, I have to admit that is not on the, but it's in our standard of review, and I just don't have that on my right now. I apologize for that. With respect to what he's calling a daubered issue and whether the issue is preserved, even if it was preserved, I just wanted to point out that the opinion that he's complaining about now came out from the witness. It wasn't a question that we asked. If the court finds that what the expert said was an opinion as to all 3,200 patient files, which I don't think you can possibly find that with respect to what the expert witness said, it was incumbent upon them at that point to move to strike, move for mistrial, object, or something of that nature because this was, if this had been ruled upon earlier and the witness just came out with it in any event, it was incumbent upon them to bring that to the attention of the court, and they did not do that at that time. And with respect to the sufficiency of the evidence, I think we can stand on the argument in our brief. Thank you. Thank you. If I could just briefly review some of the medical examiner testimony with the court. This is from… What her argument is, I think everybody's going to agree this is not a great verdict form, but what her argument is, is, you know, they check. All they had to do is check either the methadone or oxycodone. Once they checked it, we don't care how many other check marks there were, you're done. And how do you respond to that argument? How do you ignore the fact that they checked the 3? They're asked a very specific question in the verdict form. We, the jury, for count 2, find beyond a reasonable doubt that the death of J.M. resulted from the use of the following, and they check all 3. So you have to go through some mental gymnastics to say, well, they really meant any of them individually, which, as the court has pointed out, is not possible given the testimony regarding Halprazolam. But it's also not at all consistent with the certified causes of death that the medical examiners all testified to. And even as to Joey Mays, when Dr. Wilson opines at one point about, well, I think, he's not certifying this, but I think or I believe so when asked whether or not there was enough methadone to cause the death, he later at 2.15, again asked by the government to expound upon his testimony, he says, well, the methadone alone, I think, is enough to kill him. Adding on the Halprazolam as well as the additional opiate just goes much, just raises my level of suspicion even higher, and it's just, you know to me, a toxic cocktail of drugs, plural, that in my mind had no what was. It was a toxic combination of drugs which led to the death. You're saying there's not any one sliver of testimony there. We take it in the light and what's in favor of the government that would say that his testimony would be understood by the jury to mean that oxycodone alone did it or methadone, whichever one it was. I'm not sure I understand what a sliver of testimony is, but even when they went off the reservation a little bit to give a personal opinion other than the certified cause of death, they always circled back because of their professionalism to the multiple toxicity, and that's just entirely consistent with the indictment and the verdict form. All right. Thank you. Judge Antoon, you asked what the standard of review is about the double jeopardy issue. The initial declaration of a mistrial is reviewed for abuse of discretion, but the denial of the motion to dismiss the indictment on double jeopardy grounds is reviewed de novo. Both parties in their brief said the double jeopardy issue is reviewed de novo, but, I mean, that's the standard. We said that in our brief at page 35, and the government said that in their brief at page 26. There's this question about the opportunity. Like we said before, the rule certainly says opportunity, but our position is it all depends on the context of what happened at the hearing, and our interpretation of the context is the whole question is directed to Dr. Feldman rather than Mrs. Feldman. And then on the Daubert issue, this all turns on interpretation of the Tampa Bay Water against HDR Engineering Incorporated case. Our position is that the motion to eliminate the order was sufficiently definitive to preserve the error, and there was no need to make a further objection. Just so you know, Mr. Burns, I saw that in both briefs. I'm not sure I agree with it, but I did see it in both briefs. I want you to think I overlooked it, the abuse of discretion. No, no, I wasn't questioning your abilities. I was just saying that that was the position we took. But certainly the declaration of the mistrial is reviewed for abuse of discretion because that's in every case, that kind of ruling. So we're asking you to either vacate the judgment or to reverse it altogether. Thank you. Thank you.